The Honorable John C Coughenour

CC TO JUDGE DJ

____ FILED ____ ENTERED
____ LODGED ____ RECEIVED

JAN 2 4 2002   DJ

AT SEATTLE
CLERK U S DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                              DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| RUTH TREVINO LOPEZ, individually as surviving spouse, and as personal representative of the ESTATE OF BLAS ANTONIO LOPEZ, and beneficiaries, heirs, and surviving children BLAS LOPEZ, JR , EDGAR LOPEZ, YULIKSA LOPEZ and ALEXANDER LOPEZ,<br><br>Plaintiffs,<br><br>vs<br><br>UNION PACIFIC RAILROAD COMPANY and BOISE CASCADE CORPORATION,<br><br>Defendants | NO C00-0311C<br><br>DECLARATION OF NICHOLAS P SCARPELLI, JR IN SUPPORT OF PLAINTIFFS' THIRD MOTION FOR SANCTIONS & SUPPLEMENTAL EVIDENCE RE PENDING MOTIONS FOR SANCTIONS |

DECLARATION OF NICHOLAS P
SCARPELLI, JR , IN SUPPORT OF
PLAINTIFFS' THIRD MOTION FOR
SANCTIONS & SUPPLEMENTAL EVIDENCE
RE PENDING MOTIONS FOR SANCTIONS - 1

lop006 0001 da225102 1/23/02

**CARNEY BADLEY SMITH & SPELLMAN**

LAW OFFICES
A PROFESSIONAL SERVICE CORPORATION
2200 BANK OF AMERICA TOWER
700 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104-5017
FAX (206) 467-8215
TEL (206) 622-8020

Nicholas P Scarpelli, Jr, declares and states

1. I am over 18 years of age and competent to give the testimony herein

2. I am one of the attorneys for Plaintiffs Lopez in the above referenced matter

3. Attached hereto are true and accurate copies of the following exhibits

   1. Excerpts from the deposition transcript of Charles Harrison, taken January 18, 2002

   2. Copy of the "chain of custody envelope" with the disk from UP Locomotive 9123

   3. Excerpts from the deposition transcript of Brian Heikkila, taken January 4, 2002

   4. Excerpts from the deposition transcript of Robert Ryan, Vol II, taken on January 14, 2002

I declare under the penalty of perjury under the laws of the State of Washington that the foregoing is a true and correct statement.

DATED this ___24___ day of January, 2002 at Seattle, Washington

By _____
   Nicholas P Scarpelli, Jr

DECLARATION OF NICHOLAS P
SCARPELLI, JR, IN SUPPORT OF
PLAINTIFFS' THIRD MOTION FOR
SANCTIONS & SUPPLEMENTAL EVIDENCE
RE PENDING MOTIONS FOR SANCTIONS – 2

**CARNEY BADLEY SMITH & SPELLMAN**

LAW OFFICES
A PROFESSIONAL SERVICE CORPORATION
2200 BANK OF AMERICA TOWER
700 FIFTH AVENUE, SUITE 5800
SEATTLE, WA 98104-5017
FAX (206) 467-8215
TEL (206) 622-8020

lop006 0001 da225102 1/23/02

# EXHIBIT 1

```
 1
 2
 3
 4
 5
 6                  UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF WASHINGTON
 7                          AT SEATTLE
 8   ------------------------------------------------------
                                              )
 9   RUTH TREVINO LOPEZ, individually as      )
     surviving spouse, and as personal        )
10   representative of the ESTATE OF          )
     BLAS ANTONIO LOPEZ, and                  )
11   beneficiaries, heirs, and surviving      )
     children BLAS LOPEZ, JR., EDGAR          )
12   LOPEZ, YULISA LOPEZ and ALEXANDER        )
     LOPEZ,                                   )
13                  Plaintiffs,               )
                                              )
14        vs.                                 )   No. C00-0311C
                                              )
15   UNION PACIFIC RAILROAD COMPANY, and      )
     BOISE CASCADE CORPORATION,               )
16                  Defendants.               )
                                              )
17   _____)   30(b)6 DEPOSITION OF
                                              )   CHARLES HARRISON
18   LARRY MASUDA,                            )
                    Plaintiff,                )
19                                            )
          vs.                                 )
20                                            )
     UNION PACIFIC RAILROAD COMPANY,          )
21   BOISE CASCADE CORPORATION, INEZ          )
     LOPEZ and JANE DOE LOPEZ and their       )
22   marital community; and RUTH TREVINO      )   No.  C00-445C
     LOPEZ, individually and as personal      )
23   representative of the ESTATE OF BLAS     )
     ANTONIO LOPEZ,                           )
24                  Defendants.               )
                                              )
25   _____)
```

Page 10

1   also understand a certain amount of preliminary
2   information is necessary, but I also understand that
3   Mr. Wackerbarth has made very clear to you that his
4   testimony, today at least, is going to be limited to
5   the subject of your 30(b)6. So I just want to make
6   sure we're all on the same page before you get too far
7   afield.
8   Q   May I see your day planner?
9   A.  (Witness provides two pages.)
10  Q.  Where is the September 27th, 1997, entry?
11  A   It's in my office. I didn't bring that part.
12  Q.  Did you look at September 27th, 1997?
13  A.  Yes.
14  Q.  What does it say?
15  A.  I was on vacation.
16  Q.  All right, let's just keep these here for the time
17      being.
18          Do the Union Pacific rules, company rules, require
19      that all event recorders be downloaded after crossing
20      accidents?
21  A.  Yes
22  Q.  And likewise, do you understand that the FRA law
23      requires that all data event recorders be downloaded
24      after crossing accidents?
25  A.  Yes.

Page 11

1   Q   Did you download the event recorder on Locomotive 9184?
2   A   To the best of my recollection, I don't know if I did
3       or not.
4   Q   You have given us a page from your Daily Record of
5       Events September 29th, 1997, that says, it's written
6       here, "Download UP 9184 at Page." Have I read that
7       correctly?
8   A   Yes
9   Q   Is that in your writing?
10  A   Yes, it is.
11  Q   When did you make that notation?
12  A.  I would say probably on the 29th
13  Q   Of September 1997?
14  A.  Yes
15  Q   So why is it that you don't know whether you downloaded
16      the event recorder then from Locomotive 9184?
17  A   It was in 1997
18  Q   Yes  Does that refresh your recollection, looking at
19      your day planner?
20  A   It refreshes my recollection that I went out there to
21      download 9184
22  Q   And does it refresh your recollection that you did in
23      fact download 9184?
24  A   No, it doesn't.
25  Q   Can you explain how an entry could be on your day

Page 12

1       planner that says, "Download UP 9184 at Page," and you
2       didn't download it?
3   A   All that does is tells me that on that day I went to
4       Page to download 9184
5   Q   And could a fair reading of that be that you did in
6       fact download 9184?
7   A   I don't remember if I did or not
8   Q   You can't remember one way or the other?
9   A   No.
10  Q   Even though it says there, "Download UP 9184," on your
11      day planner.
12  A.  Yes
13  Q   So what have you done to determine whether you did
14      download UP Engine 9184 event recorder or whether
15      anybody else downloaded the 9184 event recorder?
16  A   I checked the files that I had on Engineer L.I Masuda.
17  Q   Pardon me?
18  A   I checked the files that I had on L I. Masuda, the
19      engineer.
20  Q   Larry Masuda?
21  A   Yes.
22  Q   All right.
23  A   To see if I had a record of 9184 in his file, and I did
24      not.
25  Q   A record of 9184? What do you mean "a record"?

Page 13

1   A   Just a printout of a download. And I checked the hard
2       drive on my laptop that I have, and I did not find any
3       record of 9184  I didn't have this laptop in '97
4   Q   Did you have a different laptop in '97?
5   A   Yes, I did.
6   Q   What type of a laptop did you have in 1997, at the time
7       of this accident?
8   A   If I remember right, it was an IBM Think Pad
9   Q   Think Pad?
10  A.  Yes, that's the type of laptop
11  Q   What kind do you have now?
12  A   Now I have a Compaq.
13  Q   When you switched from the Think Pad to the Compaq --
14      well, let me ask you this, when did you start using a
15      Compaq in your work with Union Pacific?
16  A   Oh, I don't remember when we switched  It would be a
17      guess
18  Q   Well, it wouldn't be that much of a guess, would it?
19      It would be sometime between September of '97 and
20      today
21  A   Yes
22  Q   Can you narrow it down? Was it last week?
23  A   It's been over a year since I've been using this
24      Compaq
25  Q   Can you get any closer than "a year"?

4 (Pages 10 to 13)

Page 14

1  A. Probably closer to two years.
2  Q  All right. When you switched from the Think Pad to the
3     Compaq, didn't you transfer information onto the memory
4     of the Compaq?
5  A. No.
6  Q  You didn't?
7  A  No
8  Q  What did you do with the information that was in the
9     IBM Think Pad?
10 A  When we get these new laptop computers they come to us
11    loaded with the software that we need for our job and
12    we just turn the other ones in
13 Q  Well, so who do you give the other ones to?
14 A. Somebody in Omaha. It goes into -- I don't know
15    exactly where it goes in Omaha.
16 Q. When you say "Omaha," you're talking about Union
17    Pacific's headquarters?
18 A. Yes.
19 Q. So what you're telling us is that no information that
20    was captured in the memory of the IBM Think Pad was
21    transferred to the memory of the Compaq when you
22    started using the Compaq.
23 A. That's correct
24 Q  And conceivably, had you downloaded Engine Locomotive
25    9184, as your calendar reflects you did on September

Page 15

1     the 29th, 1997, that would have been in the memory of
2     the IBM Think Pad
3  A. Not necessarily.
4  Q. I know not necessarily, but it could have been --
5  A. Yes
6  Q. -- on the IBM Think Pad, right?
7  A. Possibility, yes.
8  Q. All right, let's assume that you did download the UP
9     9184 locomotive event recorder on September 29th, 1997
10    What would you have done?
11 A  I would have downloaded to a diskette --
12 Q  So let me --
13 A. -- at that time
14 Q  Do I understand correctly that you would have taken
15    your IBM Think Pad onto the locomotive --
16 A  Yes.
17 Q  -- into the cab portion of the locomotive, correct?
18 A. Yes
19 Q. You would have plugged it into the event recorder,
20    correct?
21 A. Yes
22 Q. You would have then downloaded the information on the
23    event recorder on 9184 onto a disk that was in your IBM
24    Think Pad, correct?
25 A. Yes

Page 16

1  Q  You would have then taken that disk out of your IBM
2     Think Pad and written on it the information, correct?
3  A  Yes
4  Q  And then you would have stored that in an envelope
5     prepared by, or a form envelope that's used by Union
6     Pacific to store and create a chain of custody for
7     event recorder information, correct?
8  A  Yes
9  Q  Now, when you download it, when you download event
10    recorder information on a locomotive, do you have your
11    screen up so that you see information as it's
12    downloading?
13 A  No, I do not.
14 Q  You can't see what's being downloaded?
15 A  No.
16 Q  Do you see what's being downloaded?
17 A  I have to go into a different program and analyze the
18    -- it's a tape analysis program
19 Q  Do you do that routinely when you download?
20 A  Yes, I do.
21 Q  So if you downloaded the event recorder off of
22    Locomotive 9184 on September 29th, 1997, like your
23    calendar says you did, you would have looked at that
24    information on your screen at some point in time while
25    you were on the locomotive or later.

Page 17

1  A. You're asking me to assume that I got the download
2     or --
3  Q  Yes, yes, assume you did  You would have looked at the
4     information that was on the download, right?
5  A  Yes
6  Q  And would you have looked at it in the locomotive or
7     someplace else?
8  A  Probably in the locomotive.
9  Q  And would that information be similar to that
10    (indicating document), is that how it's downloaded?
11 A  Yes
12    MR. SCARPELLI: All right, let's mark this as
13    Exhibit 1
14        (Off the record )
15        (Exhibit Nos 1A, 1B, and 2 were marked )
16 Q  Mr Harrison, will you identify what's been marked as
17    Exhibit 1 to your deposition  1A and 1B, excuse me
18 A  It's pages out of my personal day planner
19 Q  For 19 --
20 A  For September 29, 1997
21 Q  Thank you. And would you identify what has been marked
22    as Exhibit No 2
23 A  It appears to be an analysis of a Pulse download off of
24    UP 9123
25 Q  And you understand that was the lead locomotive,

5 (Pages 14 to 17)

Page 18

1  correct, in this accident?
2  A  Yes
3  Q  Now, my question was, before we marked Exhibit 2, if
4     you downloaded the UP 9184 event recorder, as I
5     understand it you would have printed out on your screen
6     -- or I shouldn't say "print out" -- appearing on your
7     screen and perhaps you would have printed out
8     something, a graph like is represented in Exhibit No. 2
9     for Locomotive 9123, is that correct?
10 A  Yes.
11 Q. Have you ever not printed out such a graph when you've
12    downloaded?
13 A. Yes
14 Q  What percentage of times do you think you don't print
15    out such a graph when you're downloading? I mean like
16    if you've done it 500 times, are we talking about 99
17    percent of the time you would print out the graph when
18    you download?
19 A. Yes, that would be fair.
20 Q. All right, that's close enough for me  So I'm clear,
21    99 percent of the time you would print it out.
22 A  Yes
23 Q  All right. If you did the download, as your calendar
24    reflects that you did on Exhibits 1A and 1B, would you
25    have measured the wheel size?

Page 19

1  A  Yes.
2  Q  Do you have any recollection as you sit here today
3     about measuring the wheel size?
4  A. I don't recall, but it is standard operating procedure
5     to measure it.
6  Q  That's not my question  My question is, do you have
7     any recollection as you sit here today of measuring the
8     wheel size on Locomotive 9184?
9  A  No
10 Q. Which wheel would you have measured on Locomotive 9184?
11 A. On that type of locomotive, I can't remember whether
12    it's L1 or L3  I look and see which axle has a cable
13    going to it.
14 Q  When you say "that type of locomotive," you mean a
15    GE-8? Was that a GE-8?
16 A  Yes
17 Q  And Locomotive 9123 is a GE-8, too, isn't it?
18 A  Yes
19 Q  So if the cable's on the left front wheel of 9123, more
20    likely than not it would be on the left front wheel of
21    9184?
22 A. Yeah  It's the same type of locomotive
23 Q  And the same type of wheel
24 A  Yes
25 Q  All right, so you would have gone and measured what's

Page 20

1  called the witness readings on the wheel?
2  A  Yes  Witness groove
3  Q  The witness groove?
4  A  Uh-huh.
5  Q  All right. And the witness groove would have told you
6     the wheel dimension, correct?
7  A  Yes  It measures the tread on the wheel.
8  Q  That's the only one you're interested in for purposes
9     of the download of the event recorder, correct?
10 A  Yes
11 Q. Because the wheel size tells you the speed, does it
12    not?
13 A. It's figured into the program, yes.
14 Q. That in fact determines the speed in the program,
15    correct?
16 A. Yes.
17 Q  That's why it has to be an accurate reading, correct?
18 A  That's correct.
19 Q  That's why you measure down to a sixteenth, correct?
20 A  Yes.
21 Q  And you've got a caliper specifically designed for
22    that?
23 A  I have a wheel gauge, yes.
24 Q  But you can't recall doing that
25 A  No, I can't.

Page 21

1  Q  And I take it, then, you can't remember as you sit here
2     today ever determining what the speed was that was
3     recorded on Locomotive 9184 when you downloaded it as
4     reflected in your DayTimer of September the 29th, 1997.
5  A  Yes.
6  Q. Is that true?
7  A  Yes
8  Q  You cannot recall?
9  A  I cannot recall
10 Q  Do you remember anybody who was with you on September
11    29th, 1997, when you downloaded it?
12 A  Yes
13 Q  Who?
14 A  My wife
15 Q  Does she remember?
16 A  She remembers going out to Page with me
17 Q  She remembers going out to Page with you on September
18    29th, 1997?
19 A  Yes
20 Q  Does she remember you downloading it?
21 A  No
22 Q  Would there be someone else available to download the
23    9184 on the night of the accident?
24 A  I don't know if there was or not
25 Q  Somebody apparently downloaded 9123 on the night of the

6 (Pages 18 to 21)

Page 22

1  accident, right?
2  A  Yes
3  Q  What would prevent that same person from downloading
4     9184 on the same date of the accident?
5  A  I don't know.
6  Q. That could be done, could it not?
7  A. Could be, yes
8  Q. In fact, you've done that before, have you not?
9  A. Yes, I have
10 Q. Crossing accident, two locomotives in the consist,
11    download them both, stick both floppy disks in an
12    envelope and establish a chain of custody, correct?
13 A. Correct.
14 Q  That's a standard practice, isn't it?
15 A  Yes, it is.
16       MR. SCARPELLI  Let's mark this one.
17           (Exhibit No 3 was marked )
18 Q. Do you recognize what has been marked as Exhibit No. 3?
19 A. Yes.
20 Q. What is Exhibit No 3?
21 A. It appears to be a copy of a Chain of Custody envelope.
22 Q. This would be a copy of the printing and some writing
23    on a Chain of Custody envelope to keep event recorders,
24    correct?  Event recorder disks
25 A  Yes, a disk.

Page 23

1  Q. And this one that I've had marked as Exhibit 3
2     indicates that it is the Chain of Custody envelope for
3     Locomotive -- well, it doesn't have the locomotive
4     number, but it has the train symbol number, the Market
5     27, right?
6  A. MHKET 27, correct.
7  Q. That is, as you understand, the train involved in the
8     Lopez collision and death, correct?
9  A. Yes
10 Q. And this would appear to contain, if this is accurate,
11    the event recorder disk for the first locomotive,
12    correct?
13 A. Yes.
14 Q. Have you seen Exhibit 3 before today's date?
15       You've got it in front of you.
16 A. Oh, yes.
17 Q. Have you seen it before today's date?
18 A. Yes.
19 Q. All right. And this is, it's Form 20150, used by Union
20    Pacific in all train or locomotive-related employee
21    deaths, personal injuries, accidents involving
22    nonrailroad individuals, and crossing accidents, right?
23 A. Yes
24 Q. Do you keep these envelopes in your truck, in your
25    company vehicle?

Page 24

1  A  I keep them in the office, my office.
2  Q  So that's what you utilize to store these event
3     recorder disks, correct?
4  A  Yes  I put them in this envelope; then I turn it over
5     to the claims department
6  Q  And the claims department who was handling this case,
7     the gentleman's name is Stan Fetterhoff, right?
8  A  Yes.
9  Q  So if you downloaded Locomotive 9184, you would have
10    put that disk with the downloaded information in an
11    envelope similar to Exhibit No. 3, correct?
12 A. Yes.
13 Q  And then you would have signed it, indicated the wheel
14    position, wheel gauge measurement, date and time of
15    recovery, and sealed it and delivered it to Mr
16    Fetterhoff?
17 A  Yes, that's correct.
18 Q  And then he would have to sign off on it, indicating
19    when he got it, et cetera, right?
20 A  Yes.
21 Q  How would it get from Page in an envelope to Mr
22    Fetterhoff?
23 A. I would have transported it
24 Q. You would have hand-delivered it?
25 A  Yes.

Page 25

1  Q  Okay, so that much care is taken, as a matter of
2     procedure, with these event disks.  You hand deliver
3     them to the person who has requested the disk
4  A  Yes
5  Q  So then would it be fair to say that Mr McCrow --
6     well, let's read the chain of custody on Exhibit No 3
7        It was recovered, this disk from 9123 was
8     recovered by Mr. Bebout, right?
9        MR. BEARD  Object to the form of the
10    question, lack of foundation
11 Q. Go ahead
12       MR  SCARPELLI  I'm just asking him what the
13    form says.
14       MR. BEARD  Okay
15 Q  What does the form, Exhibit 3, indicate?  Who recovered
16    the disk from the lead locomotive?
17 A  Richard Bebout.
18 Q  B-E-B-O-U-T, I believe
19       All right  And then there's a signature below
20    that on the tape cover.  It looks like there's a
21    signature I can't make out, but then underneath that it
22    says, "John McCrow," or McCrow, do you see that?
23 A  Yes, I do.
24 Q  Does that mean Bebout gave it to McCrow, or can you
25    tell by looking at this?

7 (Pages 22 to 25)

# EXHIBIT 2

FORM 20150

## NOTE

For train or locomotive-related employee deaths, personal injuries, including other accidents involving non-railroad individuals, crossing accidents, and accidents involving pedestrians and trespassers the event recorder data must be taken into custody as soon as practical Locomotive wheels Must be measured

## LOCOMOTIVE AND EVENT RECORDER EVIDENCE

## CHAIN OF CUSTODY

Individual Requesting Information
Stan Fetterhoff

Train Symbol MHKET 27

Type of Incident Crossing Accident
(Crossing accident Derailment etc)

Sun Harbor Wash.
Location of Crossing Accident, Derailment, Etc

Date of Incident Sept 27, 1997

Date and Time of Recovery 27 Sept 1997
Appr. 2100
Location of Recovery Sun Harbor Wash

Witnesses Present During Recovery
R. Bebout EL.
Tom Cunha Mech.

Wheel Position 1
Wheel Gage Measurements 4v.9b
Date Wheel Gage Accuracy Last Verified _____
Recovered By Richard Bebout
(Print)
Signature (on tape copy) [signature]
John McCrow.

Received from MHKET 27
(Locomotive Symbol & Number)
By R. BEBOUT
Date 9/27/97  Time 2100  AM PM

Received from _____
By _____
Date _____ Time _____ AM PM

Received from J. McCrow
By S.W. FETTERHOFF
Date 10/2/97  Time 12 30  AM PM

Received from _____
By _____
Date _____ Time _____ AM PM

Received from _____
By _____
Date _____ Time _____ AM PM

Received from _____
By _____
Date _____ Time _____ AM PM

UP004425

# EXHIBIT 3

**Page 1**

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF THURSTON

RUTH TREVINO LOPEZ, individually, as surviving spouse, and as personal representative of the ESTATE OF BLAS ANTONIO LOPEZ, and as Guardian of the beneficiaries, heirs and surviving children BLAS LOPEZ, JR., EDGAR LOPEZ, YULISA LOPEZ and ALEXANDER LOPEZ,

Plaintiff,

vs.                              00 2 02115 9

WASHINGTON STATE DEPARTMENT OF TRANSPORTATION; UNION PACIFIC RAILROAD COMPANY; and BOISE CASCADE CORPORATION,

Defendants.

DEPOSITION UPON ORAL EXAMINATION OF BRIAN HEIKKILA

JANAURY 4, 2002
SEATTLE, WASHINGTON

**Page 2**

APPEARANCES:

FOR THE PLAINTIFF:
NICHOLAS P. SCARPELLI
CARNEY, BADLEY, SMITH AND SPELLMAN
700 FIFTH AVENUE
SUITE 5800
SEATTLE, WASHINGTON 98104

FOR DEFENDANT UPRR:
TIMOTHY D. WACKERBARTH
LANE, POWELL, SPEARS, LUBERSKY
1420 FIFTH AVENUE
SUITE 4100
SEATTLE, WASHINGTON 98101

FOR DEFENDANT BOISE:
DEAN ZONA
MINNICK-HAYNER
249 WEST ALDER
WALLA WALLA, WASHINGTON 99362

FOR CROSSCLAIM DEFENDANTS LOPEZ:
JAY E. LEIPHAM
RICHTER-WIMBERLEY
7601 WEST RIVERSIDE AVENUE
SUITE 1300
SPOKANE, WASHINGTON 99201

FOR PLAINTIFFS MASUDA AND SEWELL (RELATED ACTION):
GEORGE A. THORNTON
HUNEGS, STONE, LENEAVE, KVAS AND THORNTON
1000 SECOND AVENUE
SUITE 3310
SETTLE, WASHINGTON 98104

REPORTED BY: CARRIE J. DEHUFF, RPR, CSR
JANUARY 4, 2002
SEATTLE, WASHINGTON

**Page 3**

EXAMINATION INDEX

| CONDUCTED BY: | PAGE | CONT. |
|---|---|---|
| MR. SCARPELLI | 4 | |

EXHIBIT INDEX

| NUM | DESCRIPTION | MARKED |
|---|---|---|
| 1 | 10/29/01 HEIKKILA/WACKERBARTH LETTER | 8 |
| 2 | WITNESS' HANDWRITTEN NOTES (1 PAGE) | 53 |
| 3 | LOPEZ VS. UP TABLE OF CONTENTS | 53 |
| 4 | WITNESS' HANDWRITTEN NOTES (8 PAGES) | 53 |
| 5 | EVENT RECORDER DATA | 53 |
| 6 | UNION PACIFIC SYSTEM TIMETABLE | 53 |

**Page 4**

1  BE IT REMEMBERED, that on Friday,
2  January 4, 2002, at 9:53 a.m., at 1420 Fifth Avenue,
3  Seattle, Washington, the deposition upon oral
4  examination of BRIAN HEIKKILA was heard by
5  CARRIE J. DEHUFF, Notary Public in and for the State of
6  Washington;
7       WHEREUPON, the following proceedings were
8  had; to-wit:
9  BRIAN HEIKKILA, being first duly sworn by the
    Notary Public to tell the
10   truth, testified as follows:
11       EXAMINATION
12 BY MR. SCARPELLI:
13 Q  Would you state your name, please.
14 A  Brian Heikkila.
15 Q  What's your address?
16 A  566 Metalist Way. You want my home address or my
17    business address?
18 Q  Business address is fine.
19 A  3 North Clarendon Avenue in Avondale Estates, Georgia,
20    and I've left a card here, business card.
21 Q  And by whom are you employed?
22 A  Rail Sciences.
23 Q  How long have you been employed by Rail Sciences?
24 A  Since June of 2000.
25 Q  And what business is Rail Sciences in?

**HEIKKILA BY SCARPELLI** 41

1 using the other physical evidence in the case including
2 the train consist and the police survey.
3 Q Tell me how you arrive at that point of impact using
4 whatever materials you did.
5 A Okay, and that's -- It would be helpful to look at
6 another element of this particular Exhibit Number 5,
7 which would be Page Number 4.
8 Q So, tell us how you arrived then at the figure you did.
9 A Okay, first of all we know that the -- from the train
10 consist, and that's -- we have a copy of the train
11 consist and we broke that out. We had block totals in
12 the consist, but we developed a spread sheet for all the
13 cars and locomotives in the train, and that's on Page 5
14 for ready reference. We had photographic evidence of
15 the car that was stopped at the crossing immediately
16 north of the crossing, and that's marked on Page 5 also
17 as TTZX86123. We know that the length from there, from
18 that car to the, the front of the 9184, again from the
19 consist is 1,659 feet. We also know from the police
20 survey -- or from the survey that was done that the
21 distance between the two locomotives, the separation
22 that occurred as a result of the collision, that
23 distance was 522 feet.
24 Q Uh-huh.
25 A And then the, the incremental approximate length of the

**HEIKKILA BY SCARPELLI** 42

1 lead unit 9123 is 70 feet. So, added together, those
2 total about 2,251.
3 Q Okay.
4 A And then back to the point of impact in the middle of
5 the crossing we're in about 2,280 or thereabouts from
6 the point of impact which is between those two
7 intervals. Let me see if I can get more precise.
8 Q But how do you know that that's the point of impact,
9 just because they traveled that distance?
10 A It's approximate. I believe the policemen may have
11 concluded from their survey that it was in the range of
12 2,204 or 5. So it's within a range.
13 Q You're not saying that's the exact point, tenth of a
14 second of impact or second of impact?
15 A It's within -- I believe it's within that interval as I
16 previously testified.
17 Q Somewhere between 17:4148 and 17:4149?
18 A Yes.
19 Q What speed does the data event recorder show that the
20 train is traveling at the point of impact?
21 A It shows 42 at that point.
22 Q Do I understand correctly in reading these data event
23 recorders we come up from the bottom to go -- they read
24 up from the bottom?
25 A Well, in what regard? As far as chronologically, yes.

**HEIKKILA BY SCARPELLI** 43

1 Q Yes, that's the regard I had in mind. Okay. So, what,
2 say, ten seconds before impact, or, well, the speed
3 miles per hour here, if we just follow that down, that
4 will indicate what the data event recorder records as
5 the speed the train is traveling; correct?
6 A Yes, that's a recordation value.
7 Q What is the margin of error of a data event recorder in
8 terms of speed?
9 A I don't know about a, quote, margin of error. That
10 could vary. It could vary from -- widely. But
11 typically it's within a range -- For example, it's not
12 unusual to see circumstances where you may have two
13 event recorder downloads from the same train show a
14 slightly different speed at the simultaneous location
15 which we know would be physically impossible of a
16 couple, one or two miles per hour.
17 Q So, what would you say would be realistic margin of
18 error? Is there a margin of error that's known amongst
19 experts who read data recorders in terms of speed?
20 A Well, again, it's highly variable depending upon the
21 situation and the circumstances, but they're usually
22 within a couple of miles an hour.
23 Q So, when you say a couple, you mean two miles per hour?
24 A Typically.
25 Q Okay.

**HEIKKILA BY SCARPELLI** 44

1 A Again, we're talking event recorder?
2 Q Yeah.
3 A And that's assuming a properly functioning device and
4 proper wheel size and so forth.
5 Q Right, right. Do you have any information which would
6 lead you to believe that this was not a properly
7 functioning device?
8 A As far as the -- There are some anomalies that may be
9 attributable and probably are to the accident that would
10 not be consistent with simultaneous data in other
11 columns. For example, amperage after impact we have a
12 significant spike that's not typical -- those wouldn't
13 be typical values vis-a-vis the other data parameters
14 for that time.
15 Q Is there any information that you have that would lead
16 you to conclude that the speed is not accurate as
17 recorded by the data event recorder in this case?
18 A Again, within a resolution of the device of a couple
19 miles an hour, I believe it's approximately; correct,
20 yes.
21 Q Do you have any reason to believe that the wheel
22 measurement is incorrect?
23 A No.
24 Q Okay.
25 A Again, to the, to the extent of the resolution of the

# EXHIBIT 4

```
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF WASHINGTON
 2                       AT SEATTLE

 3   RUTH TREVINO LOPEZ, individually as      )
     surviving spouse, and as personal        )
 4   representative of the ESTATE OF BLAS     )NO. C00-0311C.
     ANTONIO LOPEZ, and beneficiaries, heirs, )
 5   and surviving children BLAS LOPEZ, JR.,  )
     EDGAR LOPEZ, YULIKSA LOPEZ and           )
 6   ALEXANDER LOPEZ,                         )
                                              )
 7                  Plaintiffs,               )
                                              )
 8             vs.                            )
                                              )
 9   UNION PACIFIC RAILROAD COMPANY and       )
     BOISE CASCADE CORPORATION,               )
10                                            )
                    Defendants.               )
11                                            )
     WOODROW DONALD SEWELL,                   )NO. C00-0441C
12                                            )
                    Plaintiff,                )
13                                            )
               vs.                            )
14                                            )
     UNION PACIFIC RAILROAD COMPANY and       )
15   BOISE CASCADE CORPORATION, and INES      )
     LOPEZ AND JANE DOE LOPEZ and their       )
16   marital community, and RUTH TREVINO      )
     LOPEZ, individually and as personal      )
17   representative of the ESTATE OF BLAS     )
     ANTONION LOPEZ,                          )
18                                            )
                    Defendants.               )
19
20         DEPOSITION UPON ORAL EXAMINATION OF
                 ROBERT A. RYAN, VOLUME II
21
     TAKEN ON:  Monday, January 14, 2002
22
     TAKEN AT:  Shilo Inn
23              50 Comstock Street
                Richland, Washington 99352
24
     REPORTED BY:  RENE' T. LaCOURSIERE, RMR, CCR
25                 CCR NO. LA-CO-UR-T383DE
```

### Page 6

```
 1       BE IT REMEMBERED that on Monday,
 2  January 14, 2002, at 12 55 p m., at Shilo Inn,
 3  50 Comstock Street, Richland, Washington, the
 4  deposition of ROBERT A RYAN, VOLUME II, was taken
 5  before Rene' T LaCoursiere, Registered Merit Reporter
 6  and Notary Public  The following proceedings took
 7  place
 8
 9  ROBERT A. RYAN, VOLUME II, being first duly sworn
10              to tell the truth,
11              the whole truth and
12              nothing but the truth,
13              testified as follows:
14
15              EXAMINATION
16  BY MR. SCARPELLI:
17  Q  Okay. Would you state your name, please?
18  A. Robert Alan Ryan.
19  Q. And do you still reside at the same address you did last
20     time I took your deposition?
21  A. Yes, I do.
22  Q. All right. And are you in the same position as the
23     manager of signal maintenance for Union Pacific?
24  A. Yes, I am.
25  Q. All right. And have you brought with you today all the
```

### Page 7

```
 1     documents that are set forth that were requested in the
 2     Subpoena dated December 31st, 2001?
 3  A. Yes, I have.
 4  Q  Have you seen this Subpoena (indicating) before today's
 5     date?
 6  A. Yes, I have.
 7  Q  Okay  And are the documents that are in front of me now
 8     all the documents that you had that are responsive to
 9     this Subpoena?
10  A. That's correct
11  Q. Now, you have another -- a personal lawyer who's with
12     you here today. And what is his name?
13         MR. BUKEY:  My name is David Bukey,
14     B-u-k-e-y
15         MR. THORNTON   I didn't hear
16         MR. SCARPELLI   David Bukey
17         MR. THORNTON   Okay
18  Q. (By Mr. Scarpelli) All right. And how were you
19     referred to Mr Bukey?
20  A. Discussion with counsel.
21         MR. WACKERBARTH   Yeah, I'll just object to
22     the extent that it calls for privileged communications
23  Q  And when you say counsel, are you talking about
24     Mr Wackerbarth?
25  A. Correct.
```

### Page 8

```
 1  Q  Okay  Is Union Pacific paying for Mr Bukey's time?
 2         MR. WACKERBARTH   I'll again object to the
 3     extent it may be privileged
 4         You can answer yes or no
 5  A. Yes
 6  Q  All right. And why are you having counsel, legal
 7     counsel, for Mr Bukey?
 8         MR. BUKEY   I'm going to object to that to the
 9     extent that it calls for attorney/client conferences
10         MR. SCARPELLI   Sure
11         MR. BUKEY   Privileges.
12  Q  (By Mr. Scarpelli) Don't tell me anything Mr Bukey
13     told you. But why do you feel it necessary to have
14     personal counsel?
15  A. To --
16         MR. WACKERBARTH   And I'll object as well
17     to the extent that it calls for privileged
18     communications --
19  Q. You don't have to.
20         MR. WACKERBARTH   -- with me on this issue
21         MR. SCARPELLI   Yeah.
22  Q  (By Mr Scarpelli) Don't tell me what anybody told you.
23     But why do you feel it's important for you to have your
24     own personal counsel here today?
25  A. To protect my interests
```

### Page 9

```
 1  Q  What do you mean by that?
 2  A. To protect me from what I don't know
 3  Q  Okay. What do you mean by that?
 4  A. I'm not aware of the ramifications of this.
 5  Q  Of what?
 6  A. Of this deposition
 7  Q  All right  And do you have a concern that there may be
 8     criminal ramifications?
 9         MR. BUKEY   I'll have the objection to the
10     extent it would call for a discussion with counsel
11         MR. SCARPELLI   Sure
12  Q  (By Mr Scarpelli) Don't tell me anything they told
13     you  But are you concerned there could be criminal
14     ramifications?
15         MR WACKERBARTH   Same objection on my part
16  Q  Go ahead
17  A. After discussion with counsel, I'm concerned
18         MR. WACKERBARTH   Yeah  Again, don't disclose
19     communications you've had with counsel
20  Q  Okay  And would you tell me when the first time that
21     you had any communication with Mr Bukey? I'm not
22     asking for what was said, but when was the first time
23     you had any communication with or to, from him?
24  A. I believe last week. I don't have -- remember the exact
25     date
```

Page 10

1  Q. And that would be sometime during the week of January
2     the 7th?
3  A. Correct.
4  Q. Okay. I'm going to try to confine my questions,
5     Mr. Ryan, to events that have occurred since the last
6     deposition. I might wander a bit, but that's not my
7     intent.
8         Have you received any reprimand from Union
9     Pacific?
10 A. No, I have not.
11 Q. Have you received -- have you talked to anybody at Union
12    Pacific about what has occurred since October the 19th,
13    2001?
14 A. Yes, I've had discussions with my director.
15 Q. And --
16 A. Dale Hughes.
17 Q. And is Dale Hughes your supervisor?
18 A. Yes.
19 Q. And is he the supervisor in Salt Lake?
20 A. Correct.
21 Q. All right. He would be responsible for the entire
22    Western Region, correct?
23 A. That's correct.
24 Q. And what did Mr. Hughes -- when did you have that
25    conversation with Mr. Hughes?

Page 11

1  A. After talking to Mr. Wackerbarth.
2         MR. WACKERBARTH: Again, no discussion of
3     communications you've had with me.
4         MR. SCARPELLI: Yeah.
5  Q. (By Mr. Scarpelli) When did you have that conversation
6     with Mr. Hughes?
7  A. After I was asked what happened to the MD boards and
8     related that information, I called Mr. Hughes.
9  Q. Okay. And that would have been you were asked about
10    what happened to the MD boards on December the 12th or
11    13th, 2001, correct?
12 A. Correct.
13 Q. All right. And what did you tell Mr. Hughes?
14 A. I told Mr. Hughes what I had done and that there was an
15    issue with that.
16 Q. And what did Mr. Hughes tell you?
17 A. He asked if I thought -- or asked if I was doing what I
18    thought was correct.
19 Q. If you were doing what you thought was correct?
20 A. Yes.
21 Q. And did Mr. Hughes say anything else to you?
22 A. He said that that's what you need to do, is what's
23    correct at the time.
24 Q. And this is after December the 12th or 13th, 2001?
25 A. Yes.

Page 12

1  Q. Did Mr. Hughes say anything else to you?
2  A. Said just to tell you what I know.
3  Q. Tell who what you know?
4  A. The attorneys.
5  Q. How did -- did you call Mr. Hughes on or about
6     December 13th or 14th, 2001?
7  A. Yes.
8  Q. How did you call him, from where?
9  A. It was either La Grande or from my home.
10 Q. What's in La Grande?
11 A. I was working in the La Grande area at the time.
12 Q. How often do you talk to Mr. Hughes?
13 A. We have weekly calls every Monday morning and then two
14    to three times a month I might call him.
15 Q. Have you talked to Mr. Hughes about these events since
16    the first occasion you talked to him?
17 A. Yes, I have.
18 Q. And when was that, the second time you talked to him?
19 A. After I decided on counsel.
20 Q. After you decided that you needed counsel?
21 A. Yes.
22 Q. All right. And what did you tell Mr. Hughes?
23 A. I informed him that I was being provided counsel.
24 Q. And you told him that Union Pacific was paying for your
25    attorney, personal attorney?

Page 13

1  A. Yes.
2  Q. And who made the decision at Union Pacific that they
3     would pay for your personal attorney?
4  A. I do not have that information.
5  Q. What did Mr. Hughes say to you when you told him that?
6  A. He seemed surprised, I guess.
7  Q. Why? Why was he surprised?
8         MR. WACKERBARTH: I'll just object to lack of
9     foundation.
10 Q. Yeah, go ahead.
11 A. I don't know.
12 Q. Okay.
13 A. He didn't say.
14 Q. What did he say?
15 A. Just that -- as he told me before, that I needed to just
16    do what -- answer the questions to the best of my
17    ability and that was it.
18 Q. When did this second conversation with Mr. Hughes take
19    place?
20 A. Would have been possibly last week.
21 Q. Has there been a third conversation with him about these
22    events?
23 A. I talked to him last night.
24 Q. Where did you call him from last night?
25 A. From home.

AFFILIATED COURT REPORTERS
509-966-6787

4 (Pages 10 to 13)

Page 46

1  A. Correct
2  Q And at that time you moved the shunts 235 feet further
3    from the crossing, correct?
4  A That's correct. Rather than do nothing, I moved them
5    out
6  Q Yeah.
7  A Until I could see if there was a continuing problem
8  Q All right Then you went back to the crossing -- well,
9    were there going to be -- did you know whether there
10   would be any train traffic across SR 124 from the late
11   afternoon when you left the crossing until 6 a.m. the
12   next morning?
13 A. I'm sure there would be
14 Q Why did you -- did you go back at 6 a.m. in the morning
15   and do the installation because you didn't want anybody
16   to see you?
17 A. Yes
18 Q And did you figure that if you went at 6 a.m. there
19   probably wouldn't be anybody around the crossing in
20   preparation for the day's events that were going to
21   occur there?
22 A. Correct
23 Q And that would be in connection with this particular
24   case?
25 A. Right.

Page 47

1  Q And so you did the change of the MD boards in the case
2    at a time when you thought nobody would see you,
3    correct?
4  A. Correct
5  Q And then -- was there anybody with you at the time?
6  A. No
7  Q. And then how did you -- where did you go after you
8    pulled the 1987 and '86 boards out and replaced them
9    with 1992 boards?
10 A. I drove to Kennewick.
11 Q. And what did you do there?
12 A. Had breakfast
13 Q. With whom?
14 A. By myself And after that I inspected crossings in
15   Kennewick
16 Q And when did you come back to the scene on SR 124?
17 A. Just prior to the time that was set for meeting
18 Q. Prior to the time that was set for the inspection by
19   Mr Farnham of the signal case?
20 A. Correct.
21 Q. All right. And then you had -- you came to the scene on
22   one of those high-rail vehicles, right?
23 A. I --
24 Q. Your vehicle has the capacity to go down a railroad
25   track, right?

Page 48

1  A. Yes, it does
2  Q And is that how you got to the railroad track from
3    Kennewick?
4  A. No
5  Q Is that how you got there the morning when you put --
6    when you changed the signals?
7  A No
8  Q Okay How long after you got to the scene on October
9    the 19th did Mr Farnham arrive and myself?
10 A. I believe you may have already been there in the lower
11   parking lot, by the packing company parking lot
12 Q And did you have a meeting with Mr Wackerbarth before
13   we were allowed to look in the signal case up at the
14   crossing?
15 A. I had -- I'm sure that I spoke with Mr. Wackerbarth,
16   yes
17 Q And did you tell him what you had done the night -- that
18   morning?
19 A. No, I did not.
20 Q Okay Did you keep it from him purposefully?
21 A. Yes
22 Q And did you tell him that you -- you probably told him
23   what you had done to the signal case in terms of
24   cleaning it up and that type of thing, right?
25 A. I do not believe we discussed that I'd given him the

Page 49

1    copies of the battery cards and the RX and phase sheets
2  Q When Mr Farnham was allowed to look in the signal case
3    did you help him identify the serial numbers?
4  A Yes, I did.
5  Q And you, in fact, read off some serial numbers to him,
6    did you not?
7  A Yes, I did.
8  Q In fact, you read off the serial numbers on the two
9    MD boards that you had put in the signal case earlier
10   that morning, correct?
11 A. Yes
12 Q Okay And did you know when you were reading off those
13   numbers that Mr Farnham and I would believe that those
14   were the numbers that you had referred to the previous
15   day in your deposition?
16      MR. WACKERBARTH I'll object to the form.
17 Q Go ahead.
18 A. Again, I made a snap decision that the boards had not
19   been in there and that it would be better to raise it up
20   to the latest ESBs and not have the question to whether
21   they were in there at the time of the accident
22 Q My question --
23 A. So --
24 Q My question was, did you intend that we should think
25   that the '92 boards were in there, the '92 boards that

## Page 86

1    think rather than have me do that while everybody
2    waits I'll just turn it over to somebody else for a
3    while
4
5             EXAMINATION
6    BY MR. LEIPHAM
7  Q  I'm not sure I understand yet why you waited until
8    November 19 and 20 to send in the two motion detector
9    cards that you removed from the case on the 19th of
10   October of 2001?
11 A. I waited until I had installed the boards that I had
12   that I knew were in proper order that were
13 Q  Compliant?
14 A. Compliant. And then I sent a shipment in to have them
15   all brought up to the latest ESB
16 Q  Okay  And those were compliant both with 89-1 and the
17   2001 ESB; is that correct?
18 A. That's correct.
19 Q. Now, when you sent in those two boards to Harmon, the
20   ones that you'd removed on October 19, 2001, what was
21   your understanding of what was going to be done to those
22   boards?
23 A. They would be brought up to the latest ESB level
24 Q  Did you understand when you sent those in that the work
25   that was required to be done to comply with ESB 89-1

## Page 87

1    would be done on those boards?
2  A. Yes
3  Q  And what was your understanding of the nature of that
4    work?
5  A. A capacitor would be removed and a resistor installed
6  Q  And would it be fair to say -- well, strike that.
7       Was it your understanding that the potential
8    defect in these boards that caused or could cause a
9    short signal was a leak in that capacitor that was to be
10   taken out?
11      MR. WACKERBARTH  I'll object to the form
12 A. I do not recall the exact wording of the ESB as far as
13   leak or short
14 Q. All right.  You knew, you understood, that there was
15   something potentially wrong with the capacitor and
16   that's why it would be removed, is that correct?
17 A. Correct.
18 Q. Did you have an understanding that the capacitor
19   could -- whether the capacitor could be checked to
20   determine if it was in fact defective before it was
21   removed from the board as part of the modification?
22 A. I'm sure it could be, yes
23 Q  Did you make any attempt to have Harmon preserve the
24   capacitors that were going to be taken -- that you knew
25   were going to be taken off of those two boards that you

## Page 88

1    had removed on October 19th?
2  A. No, I did not.
3  Q  On Exhibit 7, when you sent those boards to Harmon, does
4    it tell Harmon to make corrections for 89-1, is that
5    specified anywhere on those forms?
6  A. No, it is not.
7  Q  And why is that?
8  A. It's specified to bring it up to ESB 00-002.
9  Q  So your understanding was telling them to bring it up to
10   that level would result in them checking the boards and
11   making sure that all -- that not only that ESB, but all
12   prior ESBs would be complied with?
13 A. That's correct
14 Q  Now, the interconnect board that you were requested to
15   get pictures of, did you actually take any pictures of
16   it?
17 A. No, I did not.
18 Q. Okay  And why hasn't that been done?
19 A. Once I removed the board from the PMD, then I figured
20   I could produce the board to whoever wanted to look at
21   it.
22       (INTERRUPTION AT DOOR)
23      MR. SCARPELLI: Yes
24      MR. SCRIBNER:  Come in.
25       (3:33 RECESS 3:35)

## Page 89

1       MR. LEIPHAM.  Back on the record
2       I don't have any other questions
3    Thanks
4
5             EXAMINATION
6    BY MR. SCRIBNER.
7  Q  Mr Ryan, we deposed Mike Hughes earlier today and he
8    told us about an incident involving a school bus out at
9    this crossing. His recollection was that you called him
10   to go out and check the signals because it was reported
11   by I think a bus driver that he/she had to stop the bus
12   abruptly and some kids got bounced around  Do you
13   recall anything about that?
14 A  After speaking with Mr Hughes he reminded me of that
15   incident  He -- I don't recall specifics, I don't
16   recall dispatching him out to look at it
17      I do remember that the report was a report
18   that something had happened a week ago  We did respond,
19   tested the crossing, and no defects were found with the
20   crossing pair as I remember  Mr Hughes had
21   conversations with the school district as to what we had
22   found
23 Q  When did this take place?
24 A. I do not remember when it was.
25 Q  If you recall, was it before or after the accident